## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**MELANIE PELCHA,**

      **Plaintiff,**

    **v.**                          **Case No. 1:17–cv–497**

                                      **JUDGE DOUGLAS R. COLE**

**MW BANCORP, INC, et al.,**

      **Defendants.**

### OPINION AND ORDER

This cause is before the Court pursuant to Defendants MW Bancorp Inc.'s and Watch Hill Bank's motions for summary judgment in this age discrimination action. (Docs. 46, 47). This Court held oral argument on those motions on January 28, 2020. From the briefing and argument, it is clear that the parties have divergent views as to why the Plaintiff, Ms. Pelcha, was terminated from her position at the bank. The question before the Court, though, is whether those divergent views give rise to a genuine dispute of material fact that requires jury resolution. For the reasons discussed more fully below, the Court concludes that they do not, and thus **GRANTS** Defendant Watch Hill Bank's Motion (Doc. 46), **GRANTS IN PART** and **DENIES IN PART** Defendant MW Bancorp's Motion (Doc. 47), and **DISMISSES WITH PREJUDICE** the claims against both Defendants.

### FACTUAL BACKGROUND

This case involves a claim by Plaintiff Melanie Pelcha ("Pelcha") against her former employer, Watch Hill Bank ("Watch Hill"), and its holding company, MW

Bancorp Inc. ("MW Bancorp"), pursuant to the Age Discrimination in Employment Act ("ADEA"). Although there are several aspects to Pelcha's claim, all of them stem from her employment with Watch Hill. Pelcha began working at Watch Hill in August 2005 as a teller at the Mount Washington branch (Dep. of Melanie Pelcha ("Pelcha Dep."), 20–22, Doc. 46-2, #524–25[1]; Pl.'s Mem. in Opp'n to Watch Hill's Mot. for Summ. J. ("Pl.'s Opp'n to WHB"), Doc. 50, #832[2]). Pelcha was an at-will employee, meaning she did not work pursuant to a contract and could be terminated at any time and for any reason, but not of course for an impermissible discriminatory reason. (Pelcha Dep. at 22, #525). Although she began as a teller, she held several different job titles during her eleven-year tenure with Watch Hill. (Pelcha Dep. at 22–23, #525). She described herself "as an above-average worker with good reviews and lack of prior discipline." (Pl.'s Resp. to Interrog. No. 12, Doc. 46-6, #594). Pelcha worked under several different managers during her years of employment. (Pelcha Dep. at 21, #525). Most recently, before the events at issue here, she had reported to Janet Schneider, Watch Hill's former Senior Vice President of Deposit Operations. (Pl.'s Opp'n to WHB at #832).

---

[1] Pin citations are to the corresponding PageID number.

[2] The Court cannot rely on the Proposed Undisputed Statement of Facts, which Defendants properly filed as attachments to their motions (see Docs. 46-1, 47-1), because Pelcha did not respond to these statements pursuant to the Local Rules or Judge Black's standing order. (At the time Pelcha filed her opposition to the motion for summary judgment, this matter was assigned to Judge Black.) Instead, Pelcha stated that she "is unwilling to concede that any of [those] 'facts' are true facts; or even if they are, they may have been taken out of context." (Pl.'s Opp'n to WHB at n.1, #832). Both parties did, however, attach multiple deposition excerpts to their briefing. For clarity, to the extent the facts are derived from those documents, they will be referred to by deponent name and PageID, not document number.

### A.    Brenda Sonderman Takes Over as Pelcha's Supervisor.

Pelcha's reporting relationship changed in May of 2016. At that time, Brenda Sonderman ("Sonderman") replaced Schneider as Pelcha's supervisor. (*Id.* at #833; Pelcha Dep. at 25–28, 67–69, #526, 532). Pelcha and Sonderman did not get along. (Pelcha Dep. at 21, #525). Pelcha immediately had reservations about Sonderman as a supervisor. For example, she questioned Sonderman's knowledge of banking systems. (*Id.* at 48–49, #528). Pelcha also questioned Sonderman's qualifications to be manager (particularly in light of the fact that Pelcha had worked at Watch Hill longer), though Pelcha says she does not believe she was wrongfully passed over for the manager position. (*Id.* at 47–49, #528).

Possibly her most significant reservation, though, was that Sonderman exercised "more authority" than previous managers. (*Id.* at 47, #528). Pelcha particularly disliked Sonderman's policy requiring her direct reports to submit a written request seeking permission to take time off. (*Id.* at 27, 66–68, #526, 532). In the past, under Schneider, employees would just send an email request. (*Id.* at 69, #532). This new policy required employees under Sonderman's supervision to request leave for "vacation, sick leave, or even partial day absences for doctor's visits and other personal appointments." (Pl.'s Opp'n to WHB at #834). All requests had to be submitted in writing "by mid-month of the requested time off" (i.e. the middle of the month prior to the month in which leave was requested) so each request could "be taken into consideration when the schedule is originated." (Sonderman Dep. Ex. 4, #538). The articulated purpose of this written leave request form was so that Sonderman could effectively schedule employees. (Sonderman Dep. at 161, #909).

Sonderman instituted this policy on or about May 19, 2016, and notified her employees via email. (*Id.* at 163, #910; Pelcha Dep. at 66–68, #532).

Pelcha was undoubtedly aware of this policy at the time the facts relevant here occurred. This is so because, prior to that time, she had retroactively abided by the policy once before. After Pelcha took a pre-scheduled vacation in early June 2016, roughly a month after Sonderman began her role as supervisor, the form became an issue. Sonderman knew Pelcha "always took this time in June," but requested that Pelcha nonetheless complete a retroactive leave form upon her return. (Sonderman Dep. at 162, #910; Pelcha Dep. at 69–70, #532–33). Pelcha did so, which she recalled as not "being an issue." (Pelcha Dep. at 70, #533).

Then, just a few weeks later, in early-July 2016, Pelcha planned to take a few hours off work in the middle of the day to take her son to a dentist's appointment. (Pelcha Dep. at 77, #534). Under Sonderman's policy, Pelcha was required to fill out a written request in advance seeking that time off, even though she was only planning on missing a few hours of work. (Sonderman Dep. at 163, #910). Pelcha claims that, although she did not prepare a written request, about a week prior to the scheduled appointment, she orally sought Sonderman's approval for leave, which she maintains that Sonderman gave. (Pelcha Dep. at 77, #534). For her part, Sonderman concedes she was aware that Pelcha was planning to take the time off. (Sonderman Dep. at 159, #909).

**B.   Watch Hill Decides To Terminate Pelcha After A Dispute Relating To Leave She Took In July 2016.**

A conflict between Pelcha and Sonderman regarding this July 2016 leave is what ultimately set in motion Pelcha's termination from Watch Hill. Pelcha, believing she had Sonderman's oral approval, "bridled at the notion of having to fill out a written request as well and told Ms. Sonderman that she did not intend to do so." (Pl.'s Opp'n to WHB at #834).

The day before the dental appointment, July 7, 2016, Pelcha told Sonderman that she spoke with Joe Vortkamp, a Watch Hill vice president, and inquired whether she was required to follow Sonderman's leave policy. (Sonderman Dep. at 154–55, #543). Instead of answering, Vortkamp instructed Pelcha to check the employee handbook. (Pl.'s Opp'n to WHB at #834). Pelcha did so and concluded that she was not required to follow Sonderman's policy. (*Id.* at #834). She told Sonderman as much: "I'm not filling [the request] out because I don't have to." (Sonderman Dep. at 154–55, #543). But despite having disclaimed the intent to do so, Pelcha did in fact fill out the leave form and placed it in Sonderman's office that night before she left work. (*Id.* at 153–55, 163–64, #908–10). This day-before written notice, though, was well after the deadline that Sonderman's policy imposed.

That same afternoon, Sonderman approached Vortkamp to complain about his interference with her oversight of the employees she managed. (Sonderman Dep. at 156, 159, #543, 909) After that discussion, Vortkamp decided to call Gregory Niesen ("Niesen"), then-President and CEO of Watch Hill, that same evening. (Sonderman Dep. at 157–58, #908–09 (recounting her conversation with Niesen about his call with

5

Vortkamp)). During that call, Vortkamp informed Niesen about Pelcha's inquiry and apologized for his potential overstep of involving himself "in a personnel issue." (Sonderman Dep. at 157–58, #543–44). Vortkamp did not tell Pelcha about this call, but there is no dispute that Niesen was aware of Pelcha's actions as a result of it.

The next day, Friday, July 8, 2016, Niesen, Sonderman, and other senior managers attended a regularly-scheduled meeting of the senior management team at Watch Hill's Columbia-Tusculum branch. (Sonderman Dep. at 157–58, #908–09; Niesen Dep. at 22–23, 98, #565, #865). During that meeting, Niesen specifically raised Vortkamp's phone call from the night before and Pelcha's refusal to complete the leave request form. (Sonderman Dep. at 157–58, #908–09; Niesen Dep. at 22–23, #865). Niesen observed that he had zero tolerance for insubordination, and sought additional details. Sonderman clarified various facts about the incident, specifically that she "had asked [Pelcha] to do something[,] and she refused." (Sonderman Dep. at 158, #909; Niesen Dep. at 61, #564). Niesen reiterated his zero-tolerance policy and informed those present at the meeting that he intended to terminate Pelcha's employment. (Niesen Dep. at 100–04, #869–70). No one at the meeting indicated disagreement with that course of action. (*Id.* at 109, #871). Niesen also asked Sonderman to provide him a written record of the events involving Pelcha. (*Id.*).

After the meeting, Niesen informally consulted with his former boss Dave Tedtman[3] who convinced Niesen to meet with Pelcha "to hold sort of an official meeting with [her] to listen to her side of the story regarding Brenda Sonderman's

---

[3] According to Niesen, Tedtman was, at the time, also on the board of directors for both Watch Hill Bank and MW Bancorp. (*See* Niesen Dep. at 145, #569).

issues related to her employment." (Niesen Dep. at 145–46, #878). So, the following Monday, July 11, 2016, Niesen and another Watch Hill vice president met with Pelcha at the Mount Washington branch to discuss the issue and get her side of the story. (*Id.* at 144–45, #878; Pelcha Dep. at 57, #529). Sonderman was out of the office that day, and so did not attend. (Sonderman Dep. at 166, #911). Indeed, she states she was unaware that a meeting was going to occur that day, and was upset that it had occurred in her absence. (Sonderman Dep. at 170–71, #912)

According to Niesen, at the close of that meeting, he instructed Pelcha to meet with Sonderman the first thing the following morning (i.e., July 12th). (*Id.* at 171–72, 257–58, #550–51, 912; Niesen Dep. at 152–53, #571). Pelcha did not recall whether or not she was instructed to do this. (Pelcha Dep. at 104, #863). Sonderman, who learned of this during a call with Niesen the morning of July 12th, said she understood Niesen's instruction to Pelcha to mean that "[Pelcha] would need to initiate" the July 12th meeting. (Sonderman Dep. at 258, #551). Niesen later documented his July 11th meeting with Pelcha in a memorandum to his files. (Niesen Dep. at 150, #570; Niesen Dep. at Ex. 7, Doc. 50-8, #932–33).

## C. Watch Hill Terminates Pelcha's Employment On July 12, 2016.

Contrary to Niesen's instructions, on July 12, 2016, Pelcha did not immediately request a meeting with Sonderman. (Sonderman Dep. at 171, #912; Niesen Dep. at 126–27, #567). That is, although Pelcha was at work in the morning on July 12, 2016, she did not come to meet with Sonderman. Niesen spoke with Sonderman at about 8:00 a.m. that morning. There is some dispute as to what transpired during that call.

Niesen claims that Sonderman told him that, not only had Pelcha not requested a meeting, but that she overheard Pelcha speaking negatively of Sonderman and other bank personnel. (Niesen Dep. at 123, #875). Sonderman's account does not include any reference to Pelcha making such statements. Rather, she says that she told Niesen that she was "very disturbed" that Niesen would "come to my office, have a meeting with one of my staff members without me present." (Sonderman Dep. at 170–72, #912). She says that Niesen informed her that Pelcha was being terminated that day, but also said that, if Pelcha came to her and worked things out, that may change. (*Id.* at 172).

It is undisputed that, shortly after this call, Sonderman sent Niesen an email that detailed the facts surrounding Pelcha's alleged insubordination, as Niesen had requested the previous Friday. (Niesen Dep. at 128, 155, #567, 571; Sonderman Dep. at 260, #551; Sonderman Dep. at Ex. 6, #561–62). In the email, Sonderman opens by requesting Niesen to "review my recommendation for the immediate termination of Melanie Pelcha due to insubordination." (Sonderman Dep. at Ex. 6, #930–31). She then provides details regarding multiple instances of "insubordination," "negative work environment," and "failure to complete assigned task." (*Id.*). There is some question as to whether Sonderman herself was recommending Pelcha's termination, or rather simply parroting back the recommendation that she knew Niesen wanted in writing. (Sonderman Dep. at 194, 284, #1127, 1134). There is no dispute, though, that Sonderman believes her factual descriptions of the various incidents is accurate.

(*Id.* at 284, #1134 ("Right, right. I was – my supporting facts are my correct version.")).

Niesen and Sonderman talked again later that day, and Sonderman confirmed that Pelcha still had not come to meet with her. At approximately 5:10 p.m., Niesen came to the Mount Washington branch to meet with Pelcha and Sonderman. Niesen informed Pelcha that he was terminating her employment. (Niesen Dep. at 169–70, #575). Reading from Sonderman's email, Niesen cited Pelcha's insubordination as the basis for her termination. (*Id.* at 169–71, #575). Sonderman said nothing during the meeting. (Pelcha Dep. at 55–56, #529). Niesen did offer Pelcha a severance package (she declined), but he gave her no other reason for the employment decision and informed her that the termination was effective immediately. (Niesen Dep. at 169–71, #575).

Pelcha's job responsibilities were ultimately reallocated among several employees at Watch Hill, including Lindsay Crothers (deposit operations) and Rebecca Firestone (teller-related duties). (Dep. of Lindsay Crothers ("Crothers Dep."), at 26–28, #924; Sonderman Dep. at 236, 272–77, #553–54, #920). Sonderman took over Pelcha's regulatory and compliance tasks. (Sonderman Dep. at 272–77, #553–54.). Watch Hill made several hires, including several collegiate summer interns, and a part-time employee, Sandy Andrews. (*Id.* at 254–55, #550).

## E. Pelcha Asserts Age Discrimination.

After her termination, Pelcha sued, asserting that she was terminated due to her age. (*See* Second Am. Compl. ("SAC"), Doc. 41, ¶¶ 17–27, #476–77). While she

advances several attendant claims (discussed below), her core complaint is alleged age discrimination. In support of that allegation, Pelcha notes that she was 47 years old at the time of her termination. (*Id.* at ¶ 21). Pelcha further asserts that she felt as though Sonderman "didn't favor me, that there were other younger employees that she seemed to favor more than me[,]" including "Lindsay Crothers and Rebecca Firestone." (Pelcha Dep. at 28, #526). When asked at her deposition what favoritism Sonderman allegedly showed to Pelcha's younger co-workers, Pelcha indicated she was forced to fill out leave forms, while Lindsay Crothers was not. (*Id.* at 30–31, #527). Beyond this perceived animosity and the filling-out-the-form issue, Pelcha could not recall any other examples of Sonderman's alleged age-related bias towards her. (*Id.* at 33).

Sonderman, however, recalled at her deposition several instances when Niesen allegedly made what Sonderman claims were ageist comments about *another* employee—Becky Roush, a bank teller who was in her eighties. (Sonderman Dep. at 60, #542). Pelcha elicited testimony from Sonderman about Niesen's statements, and she points to these statements as support for her claim:

> Q.   Do you ever recall [Niesen] using the expression as it pertains to Becky Roush, that she had reached her expiration date or her shelf life?
>
> A.   Yes.
>
> Q.   Exactly what – – what was the context of that?
>
> A.   I don't recall; just insinuating that she was old.
>
> Q.   Do you recall [Niesen] counseling either you or [Schneider], if you remember, to reduce [Roush's] hours to the point where she ultimately would quit?
>
> A.   Yes.

Q.   And what was the context of that?

A.   Just exactly what you just said. Just [Niesen's] idea when he wanted somebody out was preferably to do whatever he thought would make them voluntarily leave. And in [Roush's] case it was to reduce the hours. In [Crothers'] case it was reduce her pay by $10,000 so that she would resign.

(Sonderman Dep. at 188–91, 230–31, #916, 919).

Pelcha also points to other, more general ageist comments Niesen allegedly made. (Crothers Dep. at 72–73, #927). But neither Sonderman nor Pelcha identify any instance when Niesen made ageist comments to or about Pelcha, either in connection with her termination or regarding her employment more generally. (Sonderman Dep. at 262, #522).

## PENDING MOTIONS

Following her termination, Pelcha filed an age discrimination claim with the Equal Employment Opportunity Commission ("EEOC") on or about November 30, 2016. (SAC at ¶ 16, #475). The EEOC issued her a Notice of Suit Rights on or about May 1, 2017. (*Id.*). Pelcha sued Watch Hill and MW Bancorp on July 21, 2017. (*See* Compl., Doc. 1). She subsequently amended her complaint twice, but maintains that Watch Hill: (1) violated the ADEA by terminating her employment; (2) violated Ohio's ADEA state law corollary, Ohio Revised Code § 4112, by doing the same; and that MW Bancorp (3) violated her shareholder rights pursuant to Ohio Revised Code § 1701, *et seq.* (SAC at ¶¶ 17–34, #476–78). Pelcha also asserts that MW Bancorp and Watch Hill were her joint employer, or alternatively, are "a single employer or single integrated enterprise," enabling her to hold MW Bancorp potentially liable for Watch Hill's alleged age discrimination. (*Id.* at ¶ 15, #476).

11

Watch Hill and MW Bancorp subsequently filed for summary judgment.[4] After the case was reassigned to the undersigned judge, the Sixth Circuit issued its decision in *Miles v. South Central Human Resource Agency, Inc.*, 946 F.3d 883 (6th Cir. 2020). As *Miles* was the Sixth Circuit's most recent pronouncement on the framework for assessing age discrimination claims, the Court requested additional briefing from the parties to address the case. (*See* Docs. 58, 59).

## A.    Watch Hill's Motion for Summary Judgment.

In its Motion for Summary Judgment (Doc. 46), Watch Hill argues that Pelcha's claims fail as a matter of law because she cannot establish a prima facie case of age discrimination, either by direct evidence or by circumstantial evidence. As to the former, Watch Hill asserts that there is no record evidence that shows, without making some inference as to the meaning of that evidence, that age was the but-for cause of Pelcha's termination. (*Id.* at #511–12). And as for the latter, Watch Hill argues Pelcha cannot demonstrate that she was either replaced by a younger employee or that she suffered disparate treatment because of her age, and thus cannot make out a prima facie circumstantial evidence claim. (*Id.* at #512–15). Separately, Watch Hill contends that *even if* Pelcha could establish a prima facie case, Watch Hill had a legitimate, nondiscriminatory reason for terminating her employment, and Pelcha has failed to create a genuine dispute as to whether the proffered reason was pretextual. (*Id.* at #515–18).

---

[4] Watch Hill and MW Bancorp joined each other's Motions, Replies, and Supplemental Memoranda.

Pelcha counters first by asserting there is sufficient evidence of direct age discrimination—namely Niesen's ageist comments. (Pl.'s Opp'n to WHB at #841–42). In the alternative, she claims that there is sufficient circumstantial evidence, based on Niesen's comments and the fact that she was "treated differently and more severely than younger employees." (*Id.* at #847). She also argues that there was no legitimate reason for her termination, and that the reason her employer offers—insubordination—was pretextual. (*Id.* at #851–56).

## B. MW Bancorp's Motion for Summary Judgment.

In its Motion for Summary Judgment (Doc. 47), MW Bancorp argues that Pelcha's claim against it fails as a matter of law because it is neither a single employer, nor a joint employer with Watch Hill, for purposes of ADEA liability. Further, MW Bancorp asserts that Pelcha's shareholder claim, asserting that she is entitled to information about Watch Hill because she is shareholder of MW Bancorp, fails because Pelcha is not a shareholder of Watch Hill and further that MW Bancorp is not subject to Ohio's shareholder statutes.

In response, Pelcha asserts that MW Bancorp's legal status as a non-Ohio corporation is inconsequential. (Pl.'s Resp. in Opp'n to MW Bancorp's Mot. For Summ. J. ("Pl.'s Opp'n to MW"), Doc. 51, #1007–09). This is because, in the context of its joint employer or single employer relationship with Watch Hill, there is sufficient integration among the two entities to make them a "single employer." (*Id.* at #1010–14). Therefore, she asserts, because Watch Hill is incorporated in Ohio and subject to

13

its laws as a joint employer, *ipso facto* MW Bancorp is also subject to Ohio shareholder laws. (*Id.* at 1014–18).

## DISCUSSION

### A.  Standard of Review On Summary Judgment.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347.

This Court does not have the responsibility to *sua sponte* search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). In sum, Pelcha, at this stage, must present some "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party, here Pelcha. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

**B.      Watch Hill Bank Is Entitled To Summary Judgment Because Pelcha Cannot Establish A Direct Or Circumstantial Case Of Age Discrimination.**

"[A]n employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 886 (6th Cir. 2020) (internal quotation marks and citation omitted). One impermissible reason to terminate an employee, though, is because of the employee's age—at least if the employee is over forty—as such age discrimination would violate both the ADEA, 29 U.S.C. § 621, *et seq.*, and Ohio's state law corollary, Revised Code § 4112, *et seq.* That is what Pelcha claims happened here. (SAC at ¶¶ 17–27, #476–78.)

15

Both of these statutes make it unlawful for an employer to discharge an employee "because of," among other reasons, an individual's age. 29 U.S.C. § 623(a)(1); Ohio Rev. Code § 4112.02(A). Due to the similarity of the two statutes, when a plaintiff advances claims under both the ADEA and Ohio law in federal court, the two claims are analyzed together using the same federal standard. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Wharton v. Gorman–Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009)); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 357 (6th Cir. 1998) ("Under Ohio law, the elements and burden of proof in a state age-discrimination claim parallel the ADEA analysis.").

To prove unlawful treatment under the ADEA, a plaintiff must offer evidence that the employer's action would not have occurred but-for the employee's age. *Blizzard*, 698 F.3d at 283 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). A plaintiff must do more than "show that age was a motivating factor in the adverse action." *Scheick*, 766 F.3d at 529 (citing *Gross*, 557 U.S. at 177–78). "[R]ather, the ADEA's 'because of' language requires a plaintiff 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the "but for" cause of the challenged employer decision.'" *Id.* (quoting *Gross*, 557 U.S. at 177–78). Pelcha can seek to meet this standard by "either direct or circumstantial evidence," but whichever path she chooses, the evidence she puts forward must create a triable fact as to whether her age was the "but-for" cause of her termination. *Blizzard*, 698 F.3d at 283 (quotation omitted) (citing *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009)); *see also Miles*, 946 F.3d at 887.

In that regard, to some extent, the labels themselves—direct and circumstantial—can be "unhelpful and beside the point in cases like this[.]" *Hannon v. Louisiana-Pacific Corp.*, 784 F. App'x 444, 449 (6th Cir. 2019); *accord Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2014) (Easterbrook, J.) (holding "that district courts must stop separating 'direct' from 'indirect' evidence and proceeding if they were subject to different legal standards.").

"The labels we might attach to evidence—'direct' or 'indirect'—do not matter. Evidence counts as long as it is relevant to the purported reasonable jury's inquiry." *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 683 (6th Cir. 2016) (Sutton, J.) (citing *Ortiz*, 834 F.3d at 765)). That being said, "direct" evidence is "smoking gun" evidence "that explains itself." *Id.* As such, it offers one principal benefit. If present, an employee avoids the burden of presenting evidence of a prima facie case under *McDonnell Douglas. See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) ("If the plaintiffs can establish direct evidence of discrimination, then they need not go through the *McDonnell Douglas* burden-shifting analysis."); *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001) ("The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." (quotation omitted)).

Direct evidence is rare. *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) ("It is the rare situation when direct evidence of discrimination is readily

available … ."). "[T]hus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof." *Id*. In such cases, an employee proceeds under the traditional *McDonnell Douglas* burden-shifting framework, which requires the employee to put forward all evidence of discrimination (even that evidence that was insufficient "direct" evidence), as an alternative way to demonstrate discrimination. *See id*. ("This is the reason for the *McDonnell Douglas-Burdine* burden of proof mechanism … .); s*ee also id.* ("As Justice O'Connor noted, 'the entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.'"(quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring), *overruled as stated in Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, No. 18-1171, --- S. Ct. ----, 2020 WL 1325816, at *6 (2020) (discussing Title VII) *and Gross*, 557 U.S. at 173–75 (discussing the ADEA)). Here, Pelcha's briefing argues that she has sufficient evidence to get to a jury, both under the direct evidence framework, or alternatively, the circumstantial evidence approach. The Court disagrees as to both.

### 1. *Pelcha Does Not Have Evidence Sufficient To Establish Age Discrimination Without Inference.*

Under the first approach, Pelcha must have direct evidence that her termination would not have occurred, but-for "intentional discrimination." *Geiger*, 579 F.3d at 620 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)). This means evidence that, if believed, "requires the conclusion that age was the but-for cause of the employment decision." *Scheick*, 766 F.3d at 529. Such

evidence would prove "the existence of a fact without requiring any inferences." *Rowan*, 360 F.3d at 548. As *Gross* overruled any burden-shifting approach when an employee relies on this type of evidence, the evidence must show the ultimate issue: "the plaintiff has proven 'by a preponderance of the evidence … that age was the "but for" cause of the challenged employer decision.'" *Geiger*, 579 F.3d at 621 (quoting *Gross*, 557 U.S. at 177). The evidence that Pelcha offers, though, is insufficient to establish, without inference, that age discrimination was the "but-for" cause of her termination.

"'Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of age,' satisfy this criteria." *Scott v. Potter*, 182 F. App'x 521, 526 (6th Cir. 2006) (quoting *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989)); *see also id.* at 525–26 (citing *Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 724 (8th Cir. 2001) (stating direct evidence is "evidence of conduct or statements … directly manifesting a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was the motivating factor in the employment decision")).

Sufficient evidence of discrimination to establish this but-for causation differs from case-to-case, but often, it takes the form of oral or written statements. To be sufficiently demonstrative of age discrimination, oral or written statements must be: (1) made by a decision-maker or by an agent acting within the scope of his or her employment; (2) related to the decision-making (termination) process; (3) more than merely "vague, ambiguous, or isolated"; and (4) made proximate in time to the act of

termination. *Hannon*, 784 F. App'x at 448 (quoting *Diebel v. L & H. Res., LLC*, 492 F. App'x 523, 527 (6th Cir. 2012)); *see also Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (analyzing comments in a racial discrimination case and noting to be direct evidence of racial animus, the comments must "have some connection to the decision to terminate" the employee and that they must "specifically mention" the employee).

While these factors are useful in describing the framework, the framework itself does little to clarify what type of evidence is sufficient, without inference, to substantiate a claim. Often, the answer to that question is a matter of phrasing and semantics. Take, for example, *Scott*, where an employee's supervisor purportedly said to him "'[w]hy don't you retire and make everybody happy.'" *Scott*, 182 F. App'x at 526. The Sixth Circuit said that was not enough, on its own, to constitute traditional direct evidence of age discrimination. Instead, the statement "must rest upon the notion that the term 'retire' itself is somehow directly references or necessarily means a person's age." *Id.*

In its analysis, the court noted "it is true that younger workers typically do not 'retire' from an employer, while older workers typically do." *Id.* But, "it is this 'typicality' rather than 'identity' which requires that an inference be drawn before 'Why don't you retire' can become evidence of a discriminatory animus like 'Why don't you retire; you're too old.'" *Id.* The court also noted, however, that certain statements, if used once, could be "facially innocuous," but if used routinely could be direct evidence of age discrimination. *Scott*, 182 F. App'x at 526 (noting the word "experienced," if used routinely as code to refer to an older employee could be direct

evidence if it was used in a statement like "Let's fire him; he's too experienced."). In other words, if an employer adopts a "code," where it replaces clearly discriminatory language ("old") with a different phrase ("experienced") merely as a subterfuge to gloss over discrimination, that won't work. But, as *Scott* shows, courts will not lightly reach that result.

Consider, in contrast to *Scott*, the statements made in *Scheick*. There, a high school principal filed an ADEA claim against the school district after his contract was not renewed. *Scheick*, 766 F.3d at 526–28. In setting forth his evidence, the principal referenced three comments that he claimed were sufficient to demonstrate discrimination. First, one made at the beginning of his performance review, in which he was told "The Board wants you to retire." *Id.* at 530. Second, the same board member told him "they just want somebody younger." *Id.* Third, a few weeks later the board member again reiterated that "they wanted someone younger." *Id.* Analyzing these three comments, the court determined the first did not constitute direct evidence of discrimination because the first comment "would require an inference to conclude that retirement was a proxy for age." *Id.* However, the other two comments cleared the bar, as they unambiguously indicated "that age was the but-for cause of the decision not to renew [the principal's] contract." *Scheick*, 766 F.3d at 531. That is, the latter two statements were "direct references to age," and even though the term "they" implied the Board (thereby arguably necessitating an inference, thus taking it out of the realm of direct evidence), in context, "they" could not have been a reference "to anyone other than the Board." *Id.* Thus, if these two statements were believed, no

21

inference was necessary that the Principal was being terminated due to concerns about his age.

Against this backdrop, Pelcha argues Niesen made several statements that do not require any inference she was terminated because of her age:

(1)   Mr. Niesen referred to another bank employee (Roush, who was in her eighties) as "too old," and having a "limited shelf life," and having reached or passed her "expiration date."

(2)   Mr. Niesen, on several occasions, expressed a desire to hire younger bank tellers because they were tech savvy, could attract younger customers, and by employing them, their parents would utilize the bank's services.

(3)   Mr. Niesen instructed a manager to reduce an older employee's hours (the same employee referred to above) until she resigned.

(Pl.'s Opp'n to WHB at #842).

Under the framework reiterated in *Hannon*, viewed through the lens of *Scott* and *Scheick*, this Court must determine whether Nielson's comments were: (1) made by a decision-maker, (2) related to the decision-making process, (3) more than merely "vague, ambiguous, or isolated," and (4) made proximate in time to the act of termination. *Hannon*, 784 F. App'x at 448 (citation omitted).

The first criteria is clearly established—it is uncontroverted that Niesen was Watch Hill's decision-maker as its CEO and President. But on the remaining fronts, Pelcha's evidence falls short. For example, as to causation, the Court cannot draw an inference-free conclusion that these comments were the "but-for" cause of Pelcha's termination. Niesen's comments concerned another Watch Hill employee, Becky Roush. Thus, for Pelcha to claim that those same sentiments applied to her would

require the inference that Neilson's age-related concerns about Roush also applied to Pelcha.

Moreover, the comments are not directly ageist, or at least not unambiguously so. The evidence is that Niesen said that Roush had passed "her expiration date" and that she had "limited shelf life." Admittedly, these could be references to Roush's age, but it would require an inference to get there. The term "expiration date" usually brings to mind something that is no longer effective or has become stale. "Shelf-life" usually indicates the length of time that something remains useful or fit for use. The words typically apply to items such as foodstuffs or medicines. While both of these concepts undoubtedly have a durational component, they are distinct from "age."

Fresh foods, for example, often have a short shelf life; their consumable life expiring within just a few days or weeks. Canned goods, by contrast, can have an extremely long shelf life, lasting for years before going bad. It is true that, as a general rule, the newer (i.e. younger) item, the less likely that it has expired or reached the end of its shelf life. But "expire" and "shelf life" are durational measures. While perhaps correlated with age, they are not synonymous with it. In that regard, they are not unlike "length of tenure," another durational phrase that also "may correlate empirically with age, [but] is not synonymous" with it, and thus does not constitute direct evidence of discrimination. *See Scott*, 182 F. App'x at 526 (citing *Erickson*, 271 F. 3d at 725).

Nor did Pelcha assert that Neilson routinely used the terms "expire" or "shelf life" as a proxy for "age." *See id.* Moreover, Niesen's comments did not tie concerns

about "expiration" or "shelf life" to any termination decision (Watch Hill did not terminate Roush), let alone to Pelcha's. He could have said, for example, "Let's fire her, she's about to expire." If he had, perhaps that would be smoking-gun evidence of discrimination, but that was not the case here.

Separately, Pelcha also asserts that Niesen said Roush was "'too old.'" (Pl.'s Opp'n to WHB at #842). While that phrase may well constitute direct evidence (and certainly would as to Roush), the problem for Pelcha is that the quoted phrase does not appear anywhere in the record evidence she offers in support of her motion. Instead, it appears that she may have used the quotation marks around that phrase in her briefing, not to assert that Niesen in fact said those words, but rather as a form of emphasizing that phrase in the sentence in which she employed it. (Pl.'s Opp'n to WHB at #842). The closest citation to that phrase is Sonderman, who indicated Niesen's statements were "just insinuating that [Roush] was old." (Sonderman Dep. at 230, #919). In any event, absent evidentiary support that Niesen actually said that phrase, she cannot rely on it in her briefing to satisfy her burden at the summary judgment stage.

The second category of alleged statements—those in which Niesen allegedly announced a desire to hire younger tellers to attract more business—likewise do not constitute "direct evidence" of age discrimination. The Sixth Circuit has noted that an employer's statement that the employer likes younger employees for some reason is not the same as asserting that a particular older worker was or should be fired because of age. *Miles*, 946 F.3d at 896 ("Even if [the employer] wanted to attract

young people, that says *nothing* about terminating older employees." (emphasis in original)). And, even if wanting younger workers for new positions may reflect ageist animus, an inference is still necessary to tie general ageist animus to a particular employment decision, meaning that statement fails as direct evidence.

Of course, if Niesen had said, for example, "We really need to *replace* our older tellers with younger ones," or if he had said, "I want to hire younger tellers and I want to fire the older ones," that may be a different story. But merely expressing that one likes younger employees, does not, without some additional inference, mean an employer is intent on terminating older employees. The fact that an inference is necessary takes this out of the realm of direct evidence.

Last, none of Niesen's allegedly ageist comments were made to Pelcha directly, about Pelcha individually, or made in connection, temporally or tangentially, with her termination. The only reasons Niesen provided to Pelcha for her termination were those instances set forth in Sonderman's email.

Taken together or separately, Pelcha cannot make out a direct evidence claim based on Niesen's comments alone. Certainly age-based animus could be *inferred* from these comments, but that need for that inference means the comments do not constitute direct evidence of discrimination.

In arguing for a different result, Pelcha relies on two cases, neither of which reflect the law in this Circuit. First, she asserts that direct evidence is sufficient to substantiate a claim for age discrimination if it "requires the conclusion that unlawful discrimination was *at least a motivating* factor in the employer's actions" and once

25

established, "the burden then shifts to the employer." (Pl.'s Opp'n to WHB at #841, 843) (emphasis in original). But the motivating factor or mixed motive standard has been disposed of by the Supreme Court in the ADEA context. *See Scheick*, 766 F.3d at 530. "*Wexler*'s [mixed motive] definition does not survive in the ADEA context after *Gross*," and Pelcha's reliance on that framework here is misplaced. *Id.*

Second, she relies on *Paz v. Waucanda Healthcare & Rehabilitation Centre, LLC*, 464 F.3d 659, 665–66 (7th Cir. 2006), for the proposition that analysis of allegedly ageist comments should include "how the decision-maker feels about protected employees as a class, not necessarily about the protected plaintiff employee in particular." (Pl.'s Opp'n to WHB at #843[5]). *Paz* is unhelpful in the direct evidence context, however, because there the court said the discriminatory comments could allow a finder of fact "to *infer* from all the evidence that Paz was discharged because of her national origin, pregnancy status, or in retaliation for complaining of discrimination." *Id.* at 665 (emphasis added). It seems that *Paz* is better understood as a circumstantial evidence case, then, as it is discussing when a court may "infer" discriminatory animus. In this Circuit, evidence is "direct evidence" only if it requires no inference to arrive at the conclusion that there was age discrimination afoot. Accordingly, Pelcha's arguments based on these cases are unavailing.

---

[5] Pelcha's brief labels this case, perhaps inadvertently, as Sixth Circuit precedent. In fact, *Paz* is a Seventh Circuit case that the Sixth Circuit has never cited, and that district courts in this Circuit have cited only twice.

## 2. *Pelcha's Age Discrimination Claim Fails Under The* McDonnell Douglas *Burden-Shifting Framework Too.*

Pelcha separately pursues an alternative pathway to show impermissible age discrimination, the *McDonnell Douglas* burden-shifting framework. The difference between the two approaches is not necessarily that great. "In a broad sense, *McDonnell Douglas* set forth an analytical method to examine every intentional discrimination claim, whether it proceeds through an indirect method of proof or through direct, circumstantial, or statistical evidence." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1463–64 (6th Cir. 1990) (citing *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Despite some ambiguity in the Supreme Court's decision in *Gross* as to the role for *McDonnell Douglas* (a Title VII case) in age-discrimination claims, *see Geiger*, 579 F.3d at 622 (citing *Gross*, 557 U.S. at 175 n.2), the Sixth Circuit remains committed to the proposition that ADEA claims proceeding on a theory of circumstantial evidence still utilize that framework. *Id.* ("In this circuit, however, while recognizing the differences between Title VII and the ADEA, we have long found the *McDonnell Douglas* framework useful in analyzing [the] circumstantial evidence of ADEA claims.").

"*McDonnell Douglas* first requires a plaintiff to establish a prima facie case of discrimination." *Miles*, 946 F.3d at 887 (citing *McDonnell Douglas*, 411 U.S. at 802). If Pelcha can clear the prima-facie-case threshold, the burden shifts to Watch Hill to offer a "legitimate, nondiscriminatory reason" as to why it took the adverse employment action. *Id.* at 887 (citation omitted). If Watch Hill can do so, the burden returns to Pelcha to show the proffered reason for her termination was not the true

reason, but instead merely pretext for age discrimination. *See id*. "If the plaintiff satisfies this third step, the factfinder may reasonably infer discrimination." *Id.* (citing *Moffat v. Wal-Mart Stores, Inc.*, 624 F. App'x 341, 349 (6th Cir. 2015)). And, at the summary judgment stage, the question is merely whether there is at least a genuine dispute at each stage that creates the need for a jury determination on the ultimate question of discrimination.

### a. Pelcha Can Establish Her Prima Facie Case.

To establish a prima facie case under *McDonnell Douglas*, an employee must show that: (1) they are a member of a protected class; (2) they suffered an adverse employment action; (3) they were qualified for the position; and "'(4) circumstances which support an inference of discrimination.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 808 (6th Cir. 2020) (quoting *Blizzard*, 698 F.3d at 283); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). "The plaintiff's burden to establish a prima facie case is light, one 'easily met' and 'not onerous.'" *Willard*, 952 F.3d at 808 (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)).

Perhaps because it is undisputed that Pelcha was a member of a protected class (she was older than 40), who suffered an adverse employment action (she was terminated), the parties focus their briefing and argument on the fourth prong—whether there are circumstances that support an inference of discrimination. To meet this prong, Pelcha must demonstrate circumstances from which a jury could reasonably infer that impermissible discrimination was at the root of Watch Hill's decision to terminate her employment. Examples of such evidence could include that

an employee was replaced by someone younger, *see Grosjean v. First Energy Corp.*, 349 F.3d 332, 335–36 (6th Cir. 2003) (discussing the requirements for proving discrimination by replacement), or that the employer had a practice of treating younger employees better than older ones. *See Aldridge v. City of Memphis*, 404 F. App'x 29, 40–41 (6th Cir. 2010) (discussing both direct and circumstantial evidence of ADEA disparate treatment claims). Indeed, there are suggestions in some Sixth Circuit caselaw that these are the *only* types of evidence the count in that regard. *See, e.g., Tuttle v. Metropolitan Govt. of Nashville,* 474 F.3d 307, 317 (6th Cir. 2007) (stating that fourth prong of *McDonnell Douglas*'s prima facie case in age discrimination matter requires showing that plaintiff "was replaced by a younger worker" or that "similarly situated non-protected employees were treated more favorably"). That is what Watch Hill argued here. (Defs.' Reply, Doc. 54, #1109). But other Sixth Circuit cases, even when stating the fourth prong in terms that suggest that only this evidence counts, have in fact considered ageist comments—comments that fall short of constituting direct evidence—as potential circumstantial evidence of discrimination. *See Diebel*, 492 F. App'x at 530–31 (noting a boss's comments, "even if not direct evidence of discrimination, are circumstantial evidence of age discrimination"). Given that the fourth prong requires only "circumstances which support an inference of discrimination," *Willard*, 952 F.3d at 808, the latter approach seems the appropriate one, and it is the course the Court follows here. Moreover, Pelcha's "burden to establish a prima facie case is light[,]" as the primary function of this framework is to eliminate "the most common nondiscriminatory reasons" for

29

Watch Hill's decision, "such that the plaintiff is unqualified for the position or not a member of the protected group." *Willard*, 952 F.3d at 808. The purpose is "not to stymie plaintiffs." *Id.* (citations omitted).

Here, Pelcha offers various types of evidence in an effort to meet this prong. She makes general allegations that younger employees were disciplined differently than she was. (Pl.'s Opp. to WHB at #847–49). Pelcha also argues that she was replaced by a younger employee. (*Id.* at #847). Finally, as noted above, she also put forth evidence of potentially ageist comments by Niesen, the ultimate decisionmaker, from which one could infer discriminatory intent. As the Court finds that the latter category—Niesen's comments—are sufficient to raise a plausible inference of discrimination, the Court need not consider the other evidence that Pelcha offers.

"In determining whether discriminatory comments are circumstantial evidence of discrimination in a particular case, we consider factors such as the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Griffin*, 689 F.3d at 595 (analyzing discriminatory comments in the Title VII context). The third factor, temporal proximity, is more flexible in the circumstantial evidence realm than it is in the direct evidence one. *See, e.g.*, *Ercegovich*, 154 F.3d at 357 (finding a comment made fourteen months prior to termination was relevant).

As discussed above, Niesen was the decisionmaker at Watch Hill and made comments that could be understood to suggest that he harbored, expressed, and then allegedly acted upon, ageist beliefs about certain Watch Hill employees. It appears

from the record that such alleged comments began around May 2016, when Janet Schneider left and Brenda Sonderman took over managing Pelcha's branch of Watch Hill. (*See* Schneider Dep. at 32–36, #889–90). Pelcha was terminated mid-July 2016. (Pelcha Dep. at 65, #529). Niesen's comments, allegedly made roughly two months before Pelcha's termination, are sufficiently close in time that a jury could make an "inference of discrimination."

As this Court must draw all inferences in Pelcha's favor at this stage, Niesen's comments satisfy the fourth prong of the prima facie test. As that is the only prong the defendants challenge, Pelcha satisfies her initial burden in establishing a prima facie case of age discrimination.

### b. Watch Hill Has Offered A Legitimate Non-Discriminatory Reason for Pelcha's Termination.

Just because Pelcha meets her burden at the first threshold, however, does not mean her claim survives summary judgment. "A district court may certainly assume that a plaintiff makes out a prima facie case, move past this analytical step, and conclude that summary judgment should be granted to a defendant" regardless of when "the plaintiff fails to demonstrate pretext." *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 476 (6th Cir. 2017) (citing *Frizzell v. Sw. Motor Freight*, 154 F.3d 641, 646 (6th Cir. 1998)). Such is the case here. Watch Hill has identified a legitimate reason to terminate Pelcha's employment, and Pelcha has failed to create a genuine dispute as to whether that reason was pretextual.

Watch Hill claims it terminated Pelcha's employment because of her insubordination. Insubordination is a well-settled, long-recognized, legitimate reason

31

for terminating an employee. *See, e.g.*, *Raadschelders v. Columbus State Comm. Coll.*, 377 F. Supp. 3d 844, 858 (S.D. Ohio 2019) ("The Sixth Circuit has repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action." (citing *Fullen v. City of Columbus*, 514 F. App'x 601, 606 (6th Cir. 2013) (collecting cases))). Pelcha did not disagree that this reason satisfies Watch Hill's burden. (*See* Pl.'s Opp'n to WHB at #851 ("Defendant Watch Hill Bank has met its burden of articulating a legitimate business reason for firing Ms. Pelcha[.]")). Therefore, Watch Hill has satisfied its burden of production by providing a nondiscriminatory reason for its decision to terminate Pelcha's employment.

### c. Pelcha Has Failed To Create A Genuine Dispute That Watch Hill's Proffered Reason Was Pretextual.

The burden now returns to Pelcha who, to survive summary judgment, must "produce sufficient evidence from which a jury could reasonably reject [Watch Hill's] explanation of why it fired her." *Miles*, 946 F.3d at 888 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)). "This is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* (quotation omitted). "And ultimately, this burden merges with [Pelcha's] overall burden of proving discrimination." *Id.* (citing *Provenzano*, 663 F.3d at 812).

Often, a plaintiff will show pretext in one of three ways: "(1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the discharge; or (3) that the reasons were insufficient to motivate the action." *Miles*, 946 F.3d at 888 (quoting *Chen*, 580 F.3d at 400). "But these are not the only ways that a plaintiff can establish pretext; these three categories are simply a 'convenient

way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'" *Id.* (quoting *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)). Pelcha can certainly provide evidence beyond these three categories. *See id.* Regardless of how she marshals her evidence, though, Pelcha "must articulate some cognizable explanation of how the evidence she has put forth establishes pretext." *Id.*

In her briefing, Pelcha primarily asserts versions of the second and third categories above, that Watch Hill's proffered reason did not actually motivate its decision, "or, alternatively," its reasons were insufficient to warrant termination. (Pl.'s Opp'n to WHB at #852). In support of these arguments, Pelcha offers as evidence Watch Hill's inability "to get its story straight on the true reason for Ms. Pelcha's termination" which is "highly suspicious." (*Id.* at #852–53). She also recycles her "direct" evidence, that she suffered from disparate treatment and that Niesen's comments about other employees demonstrate age discrimination against her. (*Id.* at #853). Pelcha further asserts what she calls "me too" evidence—adverse actions taken against other older employees—as evidence of this pretext. (*Id.* at #854–55). Last, she makes a bald assertion that "the punishment did not fit the crime" and was "objectively irrational from a business standpoint" because "savvy and knowledgeable executives like Gregory Niesen do not make irrational decisions unless there is a hidden agenda." (*Id.* at #855–56). Pelcha's shotgun approach to arguing pretext requires some unpacking, but ultimately, her arguments fail to establish a genuine

33

dispute as to whether Watch Hill's reasons for terminating her employment were pretextual.

### i. *Watch Hill's "Shifting" Rationales Are Not Evidence of Pretext.*

Let's start with her claim that Watch Hill had "shifting rationales" for her termination. To her credit, it is "[t]rue, under this circuit's precedent, an employer's shifting termination rationales are evidence that the proffered rationale may not have been the true motivation for the employer's actions." *Miles*, 946 F.3d at 890. But providing "additional, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications." *Miles*, 946 F.3d at 891 (quotation omitted).

Pelcha's problem here is that she fails to identify any "shift." She tries to create one by arguing that "Pelcha's failure to fill out the form was of little moment and the real reason [Niesen] wanted her gone was that she was insubordinate and had 'work issues.'" (Pl.'s Opp'n to WHB at #852). But the reason Watch Hill gave her at the time of the adverse action was in fact insubordination, so this is no shift. Pelcha separately identifies another justification, which she claims was part of Niesen's deposition testimony (but for which she provides no citation to his transcript), where he allegedly stated that Pelcha was terminated because of "conduct and performance issues … ." She argues this had nothing to do with her "insubordination, negative attitude, or failure to complete assignments," and thus this is a shifting rationale. (*Id.*). She also references Sonderman's deposition testimony (again, without citation to an actual

page to find the purported testimony) for the proposition that Sonderman "soundly rejected" Niesen's rationale for terminating Pelcha. (*Id.*).

But these allegedly shifting rationales are not sufficient to give rise to a jury question of pretext.[6] All Pelcha has shown here are, at most, additional, non-conflicting, non-discriminatory reasons for her termination. Even under her version of the facts, Watch Hill's rationales have been: (1) failing to fill out a form in violation of a rule; (2) insubordination and work issues; and (3) conduct and performance issues. To the extent that these are even different, they are certainly not in conflict, and thus do "not constitute shifting justifications." *Id*.

Separately, Pelcha notes in her brief that Sonderman, who wrote an email "recommending" that she be terminated (Sonderman Dep. at Ex. 6, #930–31), was "ordered by Mr. Niesen" to include the recommendation in the email, and that she did not do it of "her own free will." (Pl.'s Opp'n to WHB at #837). This likewise fails to satisfy Pelcha's burden of showing pretext. Indeed, it is not even clear that Pelcha claims this is evidence of pretext. (She does not include it in the pretext discussion in her brief, but Watch Hill addresses the issue in its discussion of pretext.) But, if she does, that argument fails. Whether Sonderman "recommended" the termination or

---

[6] There is also "[n]othing in either the [Federal] Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992). Nobody knows the record of a case better, perhaps, than the attorneys; "[t]hus, the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts are generally not." *Id.* "To try to review the [nearly] complete collection of exhibits, or to read each line of every page of all submitted depositions … represents to courts at both the trial and appellate levels an unrealistic ideal, an unaffordable luxury." *Id.* If there was testimony in Nielson's or Sonderman's depositions substantiating Pelcha's characterizations of that testimony, she should have cited that testimony to the Court.

not is largely irrelevant. It is undisputed that Niesen was the decisionmaker. And, whether Sonderman independently would have included a "recommendation" to terminate in her email or not, it is clear she stands by her factual account of what transpired, which is what gave rise to the finding of insubordination. (Sonderman Dep. at 283–85, #1134). In short, there is nothing about this evidence that suggests that Niesen's concern was Pelcha's age, rather than her insubordination.

Based on the record before this Court, it appears that, at the time of the termination, Watch Hill offered Pelcha no rationale beyond insubordination, and it has not offered anything other than additional, nondiscriminatory reasons (to the extent it has offered reasons at all) since then. This is insufficient evidence of pretext.

### ii.    *Pelcha Cannot Establish Disparate Treatment As Evidence of Pretext.*

Pelcha then argues that she was subjected to less-favorable working conditions than non-protected (i.e., younger) employees, and that this evidences pretext. For this argument to succeed, Pelcha must provide "evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which [Watch Hill] contends motivated its discipline of [Pelcha]." *Miles*, 946 F.3d at 893 (quotation omitted).

Analysis of her argument, at this stage, is akin to the comparator framework often utilized at the prima facie stage. *See id.* Under that framework, to carry her burden, Pelcha must "produce evidence which at a minimum establishes (1) that [she] was a member of a protected class, and (2) that for the same or similar conduct [she] was treated differently than similarly-situated employees outside the protected

class." *Id.* (quoting *Mitchell*, 964 F.2d at 582–83). That framework helps determine whether Watch Hill's treatment of Pelcha's comparators is "enough evidence for a rational juror to infer" that Watch Hill's proffered reasons for terminating Pelcha were pretextual. *Id.*

To be similarly situated to the plaintiff, though, the comparator employee "must have been the same in all relevant aspects," except for belonging to the protected class. *Kumar v. Aldrich Chem. Co.*, 911 F. Supp. 2d 571, 585 (S.D. Ohio 2012) (citing *Bobo v. United Parcel Serv.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds*, *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). In close cases, that may be a jury question. *See Jones v. Johnson*, No. 18-2252, 2020 WL 113996, at *11 (6th Cir. Jan. 9, 2020). But certainly not always. *See Tennial v. United Parcel Serv.*, 840 F.3d 292, 309–10 (6th Cir. 2016) (refusing to stay consideration of UPS's Rule 56(d) motion, stating that "Tennial's demotion was the result of his poor performance" when the three comparator employees were instead "alleged to have engaged in 'serious integrity violations'"). This is especially true when the alleged misconduct is different. *Id.*

While the Sixth Circuit has provided some useful considerations to guide the substantially-similar analysis, *see Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Laws v. HealthSouth Northern Kentucky Rehabilitation Hospital Limited Partnership*, 508 F. App'x 404, 411 (6th Cir. 2012), it has also cautioned these are not dispositive in every circumstance. *See Bobo*, 665 F.3d at 751 ("Courts should not assume the specific factors discussed in *Mitchell* are relevant factors in cases arising

37

under different circumstances, but [courts] should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." (citing *Ercegovich*, 154 F.3d at, 352)). Those considerations include whether the employee: (1) "dealt with the same supervisor," (2) was "subject to the same standards," and whether they (3) "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (citation omitted). While a comparator need not be like the plaintiff "in every single aspect of their employment," they must be alike in "all relevant aspects," *id.* at 349, and "[t]he key word in *Ercegovich* is 'relevant.'" *Bobo*, 665 F.3d at 751. This means "that the factors listed in *Mitchell* or other cases are only apposite where they are meaningful to the particular claim of discrimination presented." *Id.*

Pelcha identifies several proposed comparator employees, but none are substantially similar on the facts here, principally because the conduct at issue is meaningfully different.

*Lindsay Crothers.* Pelcha first offers Lindsay Crothers, who was 38 at the time of her deposition and thus outside the protected class, as a good comparator. But the problem for Pelcha is that Crothers' alleged shortcomings at work had nothing to do with insubordination. Rather, according to Pelcha, Crothers was gossipy, had a hard time integrating into her role, and displayed an "immature attitude" toward coworkers and customers. (Pl.'s Opp'n to WHB at #847–48; Sonderman Dep. at 78–

80, #905). As these are different forms of poor behavior, Crothers is not a good comparator for demonstrating pretext.

*Joe Vortkamp*. Joe Vortkamp is even less similar to Pelcha than Crothers is. Although also outside the protected class (he was 31 at the time of his deposition), Vortkamp was written up for improperly debiting a customer account, which is substantially different from Pelcha's alleged workplace issues. (Dep. of Joe Vortkamp at 4, Doc. 50-7, #929; *See* Dep. Ex. 38, #986).

*Rebecca Firestone*. The last remaining proposed comparator, Firestone, is perhaps Pelcha's best shot. Firestone was 30 at the time of her deposition and thus outside the protected class. (Firestone Dep. at 9, #897). At first glance, she seems to have similar leave policy issues, as she admitted during her deposition that she did "not recall filling out a form to take time off to see a doctor." (Firestone Dep. at 35, #898). But that promising start soon fell apart—after being presented with a leave request form in her handwriting, Firestone recalled that she had in fact filled out leave request forms for her doctor appointments. (*Id.* at 105–06, #1142–43). Thus, the failure to discipline her—when she had complied with the leave policy—says nothing about pretext as to Pelcha—who was terminated after she intentionally failed to do so.

### iii. *Pelcha's "Me Too" Evidence Is Insufficient To Show Pretext.*

Pelcha next tries to establish pretext by claiming this Court "may also consider adverse actions taken against other older employees as circumstantial evidence of age discrimination." (Pl.'s Opp'n to WHB at #854 (citing *Griffin*, 689 F.3d 584)). On that front, the Sixth Circuit has noted that "[e]vidence that an employer engaged in

a pattern or practice of discrimination 'may be relevant to proving an *otherwise-viable* individual claim for disparate treatment under the *McDonnell Douglas* framework.'" *Megivern v. Glacier Hills, Inc.*, 519 F. App'x 385, 399 (6th Cir. May 16, 2013) (emphasis added) (quoting *Bacon v. Honda of Am. Mfg., Inc.,* 370 F.3d 565, 575 (6th Cir. 2004)). But, "[w]hether such evidence is relevant is a case by case determination that 'depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.'" *Griffin*, 689 F.3d at 598 (quoting *Spring/United Mgmt. Co. v. Mendelsohn ("Sprint")*, 552 U.S. 379, 388 (2008)).

Here, the record evidence of this type fails to buttress Pelcha's claim. First, Pelcha has not presented an "otherwise viable" disparate treatment claim as it relates to any of the comparators discussed above. For this "me too" argument, however, she now points to Janet Schneider. Pelcha claims Schneider was terminated "through forced resignation," seemingly because she was older too, but offers no record citation supporting that fact.[7] Even if Schneider had been forced out due to her age, there is no indication Schneider exhibited any insubordination at all, let alone that she engaged in the same type of insubordination that Pelcha did. As a practical matter, too, Schneider could not have been subject to the same leave policy at issue here, which Sonderman implemented, because Sonderman replaced Schneider and adopted the policy thereafter.

---

[7] During his deposition taken by Pelcha's counsel, Niesen indicated that during his seven or eight years with Watch Hill, only three employees had ever been terminated: Pelcha, Sonderman, and a teller whose name he could not recall. (*See* Niesen Dep. at 51, #866). The teller, at least, was younger than 40 when terminated, a fact Pelcha freely admits. (Pl.'s Opp'n to WHB at #854 n.10).

40

Pelcha then raises Brenda Sonderman, who was in fact terminated. But the record offers no evidence as to *why* Sonderman was terminated, other than that it was *not* for "violating the code of conduct," which would ostensibly encompass insubordination. (*See* Niesen Dep. at 52–53, #866).

Finally, to the extent Pelcha argues Niesen's comments about Becky Roush are "me too" evidence, Roush was never terminated, but retired in March 2019. (*See* Niesen Dep. at 185–86, #1181). In short, none of this evidence suffices to meet Pelcha's burden to demonstrate Watch Hill's reason for terminating her employment was impermissible pretext.

### iv. *Niesen's Comments Alone Are Insufficient Evidence of Pretextual Age Discrimination.*

Fourth, Pelcha asserts that Niesen's allegedly ageist comments (described above) sufficiently demonstrate pretext.[8] This is admittedly a closer call than the other evidence she presents. Certainly, discriminatory comments, in addition to establishing a prima facie showing, can in some circumstances also show pretext. *See Willard*, 952 F.3d at 813; *Blizzard*, 698 F.3d at 287 ("'discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext'" (quoting *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009)). This is all the more the case when, as here, the speaker is also the decision-maker. *See Blizzard*, 698 F.3d at 287.

---

[8] This is essentially an argument that Watch Hill's "proffered reasons did not actually motivate" her discharge. *See Blizzard*, 698 F.3d at 287, n.6. This would require the employee to "admit the factual basis underlying the employers proffered explanation and further admit that such conduct could motivate dismissal." *Id.* at 287 n.6. This is problematic because Pelcha disputes the factual basis for Watch Hill's termination decision in the first place.

But exactly what kind of comments suffice to show pretext is a bit of a quandary. In particular, can the Court consider only comments directly related to the termination decision? Certain Sixth Circuit cases seem to establish a bright-line rule—remarks that are "unrelated to the decision to dismiss [the employee] from her employment, … do not constitute evidence of discrimination." *Id.* at 287. *See also Geiger*, 579 F.3d at 621 ("'Statements … by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden ... of demonstrating animus.'" (alterations in original) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir.1998)). Other cases, though, have noted that, while "a direct nexus between the allegedly discriminatory remarks and the challenged employment action affects the remark's probative value, the absence of a direct nexus does not necessarily render a discriminatory remark irrelevant." *Ercegovich*, 154 F.3d at 355.

Similarly, the Sixth Circuit has noted in one (admittedly unpublished) decision that the reliance on statements allegedly directed at *other* employees makes any showing of pretext more "attenuated," *Bigelow v. ANR Pipeline Co.*, No. 96-1642, 1997 WL 428964, at *5 (6th Cir. July 29, 1997), but has also suggested that courts may rely on such statements, at least to "buttress" a finding of discrimination. *See Howley v. Fed. Express Corp.*, 682 F. App'x 439, 446 (6th Cir. 2017). Finally, appellate courts seem to agree that "isolated" or "sparse" age-related comments will not suffice. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (noting that "isolated and ambiguous comments are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination" (quotations omitted));

*Mikinberg v. Bemis Co.*, 555 F. App'x 34, 36 (2nd Cir. 2014) ("The sparse age-related comments to which Mikinberg points are inadequate to suggest these reasons are pretextual.").

At bottom, perhaps it merely comes down to a "commonsense" assessment, *see Miles*, 946 F.3d at 888, of the remarks, both in the context of the situation in which they were offered, the person who made them, the person to whom they were made, and the other evidence of pretext. In *Blizzard*, for example, comments that "most of the people here are the old people like you," that the employee had been "in his job too long," and that he was "lazy and didn't work," were insufficient to establish pretext, even though directed at the employee at issue, when the speaker was not a nondecisionmaker. *Blizzard*, 698 F.3d at 287. But in *Willard*, 952 F.3d at 813, repeated and unambiguous comments by decisionmakers, again directed to the plaintiff himself, that he was "old and fat," "over-the-hill," and calling him a "dinosaur" and "grandpa," were sufficient evidence of pretext.

The comments here seem to occupy somewhat of a middleground. There is no question that the speaker, Niesen, was the decisionmaker. But the statements to which Pelcha points were not pervasive (they appear to have been sporadic or infrequent comments that were directed solely at only one employee, Roush), were not unambiguously ageist (for the reasons discussed above, the comments arguably related to duration rather than age), were not directed to Pelcha, or even an employee near Pelcha's age, and were not made in connection with her termination decision (indeed, were not made in connection with *any* termination decision). Allowing such

comments to create a jury question would essentially mean that any potentially ageist comments, about any employee, at any time, so long as made by the same person who made the decision at issue would suffice to get past summary judgment— even if the terminated employee is of a significantly different age from the employee to whom the comments were directed. That is not reasonable. Put somewhat differently, even if the evidence suggests that Niesen may have had an age-based animus toward a worker who was in her eighties, that does not give rise to a reasonable inference that he likewise had such an animus to Pelcha, who was in her forties. Niesen's further comments about his desire to have young tellers perhaps add some additional weight to his comments about Roush, but again, as the Sixth Circuit has held, a stated desire to hire young workers is not the same as a desire to fire older ones. *See Miles*, 946 F.3d at 896 ("Even if [the employer] wanted to attract young people, that says *nothing* about terminating older employees." (emphasis in original)).

Is sum, while the analysis may well be different if it were Roush, rather than Pelcha, who had been terminated, the Court concludes that a jury could not reasonably infer a discriminatory intent *as to Pelcha* based on the cited comments, whether considered alone or in combination. Thus, this evidence does not establish a jury question on pretext.

> ### v. *Pelcha's View That Her Punishment Did Not Fit The Crime Is Insufficient Evidence of Pretext.*

Fifth and finally, Pelcha's argument that her punishment did not fit the crime and that she believes her termination was "objectively irrational" is of little consequence. "[A]n employer may fire an employee for a good reason, a bad reason, a

reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Miles*, 946 F.3d at 886. "'[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.'" *Id.* at 896 (quoting *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)). Watch Hill's employee handbook specifically says, "Watch Hill bank reserves the right to terminate employment for any reason." (Watch Hill Employee Handbook, Doc. 50-8, #971). Even Pelcha understood she was an "at will" employee, meaning Watch Hill could terminate her employment at any time. (Pelcha Dep. at 111, #535). The fact that she disagreed that she should have been terminated for the stated reason does not show that the offered reason was pretext for discrimination.

Likewise, Pelcha's assertion that Watch Hill failed to follow its internal discipline policy does not establish pretext. *See, e.g.*, *Steele v. Edward D. Jones & Co., L.P.*, 780 F. App'x 313, 317 (6th Cir. 2019) (noting an employer declining to follow a progressive discipline policy was insufficient evidence of pretext); *Wolf v. Antonio Sofo & Son Importing Co.*, 919 F. Supp. 2d 916, 926 (N.D. Ohio 2012) (failing to follow internal progressive discipline policy before terminating an at-will employee failed to establish pretext). To be sure, discipline short of termination was an option, and one that Watch Hill did not exercise in her case. But that is not indicative of pretext. Watch Hill's employee handbook says that "corrective action is *typically* 'progressive' and *may* follow" certain steps. (Watch Hill Employee Handbook, Doc. 50-8, #971 (emphasis added)). Moreover, the very next sentence says that "[s]ome performance

45

concerns are serious enough to not follow a progressive schedule." (*Id.*). Insubordination, for which Niesen claims he had "zero tolerance," may not necessarily result in progressive discipline, but instead could be "serious enough" to warrant immediate termination. In that regard, Pelcha does not put forth any evidence that other, non-protected employees were afforded progressive discipline following acts of insubordination like hers. Her argument on this point is unavailing.

### vi. *Conclusion*

Pelcha has sufficiently established a prima facie case of age discrimination to avoid summary judgment. But Watch Hill responded by providing a legitimate, non-discriminatory reason for terminating her employment. Thus, this case comes down to the question of pretext—in particular, has Pelcha created a jury question as to whether Watch Hill's stated reason was mere pretext and that the but-for cause of her termination was age discrimination?

At least one witness described the workplace at Watch Hill as "toxic." (Schneider Dep. at 43–44, #892). That may well have been true. Some testimony suggested that in-fighting and negativity abounded among employees. And there is evidence from which one could argue that Niesen could be harsh or overly reactive in personnel decisions, perhaps making him a difficult boss, and maybe contributing to negative perceptions of the work environment. There is likewise no question that three management personnel, Schneider, Sonderman, and Pelcha, all resigned or were terminated in a short period of time.

But over-reacting, or even creating a "toxic" work environment, is different from age-discrimination, and it is Pelcha's task to create a jury question on that latter issue here. The evidence set forth above, considered in its totality, fails to do so.[9] In short, the Court finds that, considering all of the record evidence, there is no basis on which a jury could reasonably infer that the but-for cause of 47-year-old Pelcha's termination was her age. Accordingly, Watch Hill is entitled to summary judgment on the ADEA claim (Count I). Moreover, because Pelcha's state law anti-age discrimination claim (Count II) follows her federal claim, Watch Hill is entitled to summary judgment on that claim as well.

## C.    MW Bancorp is Entitled to Partial Summary Judgment.

Having granted Watch Hill summary judgment on the discrimination claims, the Court finds that it need not, and thus does not, reach the issue of whether MW Bancorp is entitled to summary judgment on Pelcha's joint employer or single employer claim. As Watch Hill did not violate the ADEA, the single or joint employer question is of no moment, and reaching that issue would amount to little more than an advisory opinion. *See, e.g.*, *Wilson v. O'Brien & Wolf, LLP*, No. 0:17-cv-01885, 2018 WL 296074 (D. Minn. Jan. 4, 2018) ("Plaintiffs' suit before this Court is nothing more than an academic exercise, seeking an advisory opinion from this Court, having no impact on the parties' rights or obligations."). Indeed, Pelcha's counsel confirmed at oral argument that joining MW Bancorp in this action was done more by way of

---

[9] While the Court's opinion discusses the evidence of pretext by grouping it in categories, the Court did so in an effort to clearly set forth its analysis as to each different kind of evidence. In making the ultimate decision as to whether the evidence created a jury question regarding pretext, though, the Court considered all such evidence as a whole.

seeking an insurance policy related to collectability in the event that she prevailed (given MW Bancorp's acquisition of Watch Hill), not an indication that MW Bancorp's own conduct was in any way related to the merits of Pelcha's age discrimination claim. Thus the Court declines to do address the single or joint employer issues until such a time, if ever, that a ruling is necessary.

Pelcha's shareholder claim, by contrast, remains a live issue, but not for long, as MW Bancorp is entitled to summary judgment on that claim. Pelcha purports to assert shareholder rights, under Ohio law, as a means for demanding certain information MW Bancorp (and perhaps about Watch Hill, which is a wholly owned subsidiary of MW Bancorp). That claim is a non-starter. To be sure, it appears that Pelcha owns shares in MW Bancorp, but MW Bancorp is a Maryland corporation. Under the internal affairs doctrine, shareholder rights are governed by the laws of the state of incorporation. *See Edgar v. MITE Corp.*, 457 U.S. 624, 465 (1982). Thus, Ohio law provides no basis for Pelcha to assert shareholder rights.

Confronted with this problem at oral argument, her counsel suggested that, as Pelcha owns shares in MW Bancorp, and as MW Bancorp owns 100% of the shares of Watch Hill, perhaps Pelcha is an indirect shareholder in Watch Hill, which is an Ohio company. That argument fails, as well. Shareholders own shares in the company; they do not own the company's assets. Here, Watch Hill's shares are an asset that MW Bancorp owns. Pelcha's claim that she is an indirect owner of those shares is akin to claiming that, if she owned shares in Ford, she would be a partial owner of the cars that Ford produces, or the plants in which Ford produces them. Poppycock.

To be sure, MW Bancorp can assert shareholder rights in Watch Hill, and those rights are governed by Ohio law. But Pelcha, in her capacity as a shareholder of MW Bancorp, has no basis, direct or indirect, for asserting those rights.

## CONCLUSION

For the reasons above, the Court **GRANTS** Defendant Watch Hill Bank's Motion for Summary Judgment (Doc. 46), **GRANTS IN PART** Defendant MW Bancorp's Motion for Summary Judgment (Doc. 47), as it relates to the shareholder claim and **DENIES IN PART AS MOOT** MW Bancorp's Motion as it pertains to its status as a single or joint employer. The Court **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

April 17, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**